IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

vs.                                         CRIMINAL ACTION No.: 3:17-CR-131-HTW-LRA

BOBBY RAY MAHONE

<u>ORDER</u>

BEFORE THIS COURT is the defendant's Motion for Compassionate Release Due to COVID-19. **[Docket no. 66]**. Defendant, by his motion, asks this court to reduce his sentence or to order the United States Bureau of Prisons to allow him to serve the remainder of his sentence on home detention. The United States of America opposes such motion, saying that defendant has failed to meet his burden of proof and that this court does not have the jurisdiction to order home detention. This court has reviewed the submissions of the parties and finds that defendant's Motion for Compassionate Release Due to COVID-19 **[Docket no. 66]** must be denied for the reasons set forth below.

## I.   FACTUAL BASIS

On November 7, 2017, defendant Bobby Ray Mahone (hereinafter referred to as "Mahone") was indicted for Hobbs Act Robbery (Title 18 U.S.C. § 1951(a)) and brandishing a firearm during a crime of violence (Title 18 U.S.C. § 924(c)(1)). Thereafter, Mahone elected to change his plea to guilty and this court held a change of plea hearing on April 9, 2018, to count 2 of the indictment – that which charged him with brandishing a firearm during a crime of violence. On August 17, 2018, this court sentenced him to the custody of the United States Bureau of Prisons (hereinafter referred to as "BOP") to be imprisoned for a term of 84 months.

Mahone is currently serving his federal sentence at Yazoo City Federal Correctional Institution's medium security section (hereinafter referred to as "FCI Yazoo City Medium") located in Yazoo City, Mississippi, and is scheduled to be released on October 30, 2023. As of September 8, 2020, BOP reports that FCI Yazoo City Medium has 17 confirmed COVID-19 cases out of a total population of 1,340.

Mahone, now a twenty-five (25) year old African-American male, has not provided this court with any proof or allegation about when or how he initially filed with the Warden of FCI Yazoo City Medium. The government similarly has provided no allegations or proof that Mahone failed to complete this mandatory step.

<u>BOP and the COVID-19 Pandemic</u>

COVID-19, an extremely contagious illness, has caused many deaths in the United States in a short period of time and has resulted in massive disruption to the American society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (3/19/2020). BOP has had a Pandemic Influenza Plan in place since 2012. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January, 2020. At that time, BOP established a working group to develop policies in consultation

with subject matter experts in the Centers for Disease Control. BOP also reviewed guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan (hereinafter referred to as "Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current, modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least fourteen (14) days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP further has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step, as well, will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of fourteen (14) days, or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19, or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as

3

Philadelphia, Pennsylvania, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g., medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended, absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

BOP stopped social and legal visits on March 13, 2020, and those visits remain suspended, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2)[1], and to

---

[1] (c) Prerelease custody.—[…]

        (2) Home confinement authority.--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.

4

move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g)[2].

---

The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.

18 U.S.C.A. § 3624 (West)

[2] (g) Elderly and family reunification for certain nonviolent offenders pilot program

    (1) Program authorized

        (A) In general

            The Attorney General shall conduct a pilot program to determine the effectiveness of removing eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities and placing such offenders on home detention until the expiration of the prison term to which the offender was sentenced.

        (B) Placement in home detention

            In carrying out a pilot program as described in subparagraph (A), the Attorney General may release some or all eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities to home detention, upon written request from either the Bureau of Prisons or an eligible elderly offender or eligible terminally ill offender.

        (C) Waiver

            The Attorney General is authorized to waive the requirements of section 3624 of Title 18 as necessary to provide for the release of some or all eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities to home detention for the purposes of the pilot program under this subsection.

    (2) Violation of terms of home detention

        A violation by an eligible elderly offender or eligible terminally ill offender of the terms of home detention (including the commission of another Federal, State, or local crime) shall result in the removal of that offender from home detention and the return of that offender to the designated Bureau of Prisons institution in which that offender was imprisoned immediately before placement on home detention under paragraph (1), or to another appropriate Bureau of Prisons institution, as determined by the Bureau of Prisons.

    (3) Scope of pilot program

        A pilot program under paragraph (1) shall be conducted through Bureau of Prisons facilities designated by the Attorney General as appropriate for the pilot program and shall be carried out during fiscal years 2019 through 2023.

    (4) Implementation and evaluation

        The Attorney General shall monitor and evaluate each eligible elderly offender or eligible terminally ill offender placed on home detention under this section, and shall report to Congress concerning the experience with the program at the end of the period described in paragraph (3). The Administrative Office of the United States Courts and the United States probation offices shall provide such assistance and carry out such functions as the Attorney General may request in monitoring, supervising, providing services to, and evaluating eligible elderly offenders and eligible terminally ill offenders released to home detention under this section.

    (5) Definitions

        In this section:

            (A) Eligible elderly offender

                The term "eligible elderly offender" means an offender in the custody of the Bureau of Prisons--

5

(i) who is not less than 60 years of age;

(ii) who is serving a term of imprisonment that is not life imprisonment based on conviction for an offense or offenses that do not include any crime of violence (as defined in section 16 of Title 18), sex offense (as defined in section 20911(5) of this title), offense described in section 2332b(g)(5)(B) of Title 18, or offense under chapter 37 of Title 18, and has served 2/3 of the term of imprisonment to which the offender was sentenced;

(iii) who has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense described in clause (ii);

(iv) who has not been determined by the Bureau of Prisons, on the basis of information the Bureau uses to make custody classifications, and in the sole discretion of the Bureau, to have a history of violence, or of engaging in conduct constituting a sex offense or other offense described in clause (ii);

(v) who has not escaped, or attempted to escape, from a Bureau of Prisons institution;

(vi) with respect to whom the Bureau of Prisons has determined that release to home detention under this section will result in a substantial net reduction of costs to the Federal Government; and

(vii) who has been determined by the Bureau of Prisons to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention.

(B) Home detention

The term "home detention" has the same meaning given the term in the Federal Sentencing Guidelines as of April 9, 2008, and includes detention in a nursing home or other residential long-term care facility.

(C) Term of imprisonment

The term "term of imprisonment" includes multiple terms of imprisonment ordered to run consecutively or concurrently, which shall be treated as a single, aggregate term of imprisonment for purposes of this section.

(D) Eligible terminally ill offender

The term "eligible terminally ill offender" means an offender in the custody of the Bureau of Prisons who--

(i) is serving a term of imprisonment based on conviction for an offense or offenses that do not include any crime of violence (as defined in section 16(a) of Title 18), sex offense (as defined in section 20911(5) of this title), offense described in section 2332b(g)(5)(B) of Title 18, or offense under chapter 37 of Title 18;

(ii) satisfies the criteria specified in clauses (iii) through (vii) of subparagraph (A); and

(iii) has been determined by a medical doctor approved by the Bureau of Prisons to be--

(I) in need of care at a nursing home, intermediate care facility, or assisted living facility, as those terms are defined in section 1715w of Title 12; or

(II) diagnosed with a terminal illness.

34 U.S.C.A. § 60541 (West)

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of August 7, 2020, BOP has transferred 7,378 inmates to home confinement.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates, while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

**II. ANALYSIS**

Mahone filed his motion, citing Title 18 U.S.C. § 3582(c)(1)(A) for authority. Section 3582, commonly referred to as the First Step Act, provides:

> (c) Modification of an imposed term of imprisonment.--The court may not modify a term of imprisonment once it has been imposed except that--
>
> > (1) in any case—
> >
> > > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and

(B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; […]

18 U.S.C.A. § 3582 (West).

a. *Exhaustion of Administrative Remedy*

The parties have provided this court no allegations about whether Mahone has or has not exhausted his administrative remedies.

b. *Burden of Proof*

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

To establish that defendant should be afforded compassionate release, the defendant must show "extraordinary and compelling circumstances exist". The United States Congress further defined its intent in Title 28 U.S.C. § 994(t) which provides:

The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for

sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.

For further guidance, the Sentencing Guidelines policy statement at § 1B1.13 provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release as follows:

1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Mahone argues that the First Step Act's "extraordinary and compelling reasons" are satisfied because: his counsel provided ineffective assistance of counsel; and that he pled guilty to an unconstitutionally vague statute.

The government responds that Mahone's cited reasons do not fall within the purview of the First Step Act, Compassionate Release statute. According to the government, defendant's motion is more properly addressed as a Motion to Set Aside, Vacate, or Amend Mahone's sentence under the authority of Title 28 U.S.C. § 2255. This court agrees with the government.

**CONCLUSION**

**IT IS, THEREFORE, ORDERED that defendant's Motion for Compassionate Release Due to COVID-19 [Docket no. 66] is hereby DENIED for the reasons stated above.**

**IT IS FURTHER ORDERED that this ruling does not address the merits of Mahone's argument and he may re-urge his motion under the proper authority if he so chooses.**

**SO ORDERED this the 13th day of September, 2020.**

s/ HENRY T. WINGATE
**UNITED STATES DISTRICT COURT JUDGE**